**CITY OF FARGO, Plaintiff and Appellant,**

v.

**William Noble THOMPSON, Defendant and Appellee.**

**CITY OF FARGO, Plaintiff and Appellant,**

v.

**Timothy Duane DORNHEIM, Defendant and Appellee.**

**CITY OF FARGO, Plaintiff and Appellant,**

v.

**Charles Herman BOMMERSBACH, Defendant and Appellee.**

**CITY OF FARGO, Plaintiff and Appellant,**

v.

**Christopher Michael FRANEK, Defendant and Appellee.**

Cr. Nos. 940008, 940009, 940010 to 940012.

Supreme Court of North Dakota.

Aug. 24, 1994.

Thomas J. Gaughan, City Prosecutor, Fargo, for plaintiff and appellant.

Robin L. Olson, of Nelson Law Office, Fargo, for defendants and appellees.

SANDSTROM, Justice.

In *City of Fargo v. Stutlien*, 505 N.W.2d 738 (N.D.1993), we held illegal a court-ordered procedure for mandatory minimum pe-

riods of detention for all driving under the influence and actual physical control arrestees. But we reversed the dismissal of criminal prosecutions against the defendants charged in those cases, concluding absent "evidence that these minimum periods of detention actually prejudiced the defendants' right to present a defense and have a fair trial, the trial court's dismissal of the charges was speculative and premature." *Stutlien* at 746. After separate evidentiary hearings on remand, the trial court found William Thompson, Timothy Dornheim, Charles Bommersbach, and Christopher Franek had satisfactorily shown their right to a fair trial was actually prejudiced by their detentions, and dismissed the charges pending against them. The City of Fargo appeals, claiming none of these defendants established actual prejudice.

We hold there is sufficient competent evidence to support the trial court's findings of actual prejudice to Thompson and Bommersbach, and the findings are not contrary to the manifest weight of the evidence. We affirm the dismissal of the charges against Thompson and Bommersbach. However, we hold there is insufficient competent evidence to support the trial court's findings of actual prejudice to Dornheim and Franek, and the findings are contrary to the manifest weight of the evidence. We reverse the dismissal of the charges against Dornheim and Franek and remand for further proceedings.

The trial court had jurisdiction under Art. VI, § 1, N.D. Const., and N.D.C.C. §§ 27–07.1–17(3); 27–07.1–18; 40–18–15.1; and 40–18–19. This Court has jurisdiction under Art. VI, § 6, N.D. Const., and N.D.C.C. § 29–28–07(1). The appeals were timely under Rule 4(b), N.D.R.App.P.

I

 To establish actual prejudice, a defendant must "factually link her loss of liberty with any specific prejudice to her right to a fair trial." *City of Jamestown v. Erdelt,* 513 N.W.2d 82, 85 (N.D.1994). In other words, a defendant "must show that 'lost evidence or testimony would have been helpful to his defense, that the evidence would have been significant, and that the evidence or testimo-

ny was lost' as a result of the statutory deprivations of which he complains." *State v. Knoll,* 322 N.C. 535, 369 S.E.2d 558, 565 (1988) (quoting *State v. Dietz,* 289 N.C. 488, 223 S.E.2d 357, 360 (1976)). As we noted in *Stutlien* at 744, also bearing on the question of actual prejudice to driving under the influence or actual physical control arrestees is the statutory right under N.D.C.C. § 39–20–02 to a reasonable opportunity to obtain an additional, independent blood-alcohol test. *See State v. Messner,* 481 N.W.2d 236, 240 (N.D.1992); *State v. Dressler,* 433 N.W.2d 549, 550 (N.D.Ct.App.1988). Likewise, under N.D.C.C. § 29–05–20, driving under the influence or actual physical control arrestees have a statutory right to meaningfully consult with an attorney. *See City of Mandan v. Jewett,* 517 N.W.2d 640, 641 (N.D.1994) (right also applies before arrestee decides whether to submit to blood-alcohol testing); *Bickler v. North Dakota State Highway Commissioner,* 423 N.W.2d 146, 147 (N.D. 1988) (same); *Kuntz v. State Highway Commissioner,* 405 N.W.2d 285, 287 (N.D.1987) (same).

 In all of these cases, the City argues opinion testimony about sobriety is immaterial to the finding of actual prejudice because an alcohol concentration of .10 percent by weight is a per se violation of the law. We reject this argument because a traffic citation alleging driving under the influence or actual physical control charges both a per se violation as well as a general driving under the influence violation under N.D.C.C. § 39–08–01(1). *City of Minot v. Bjelland,* 452 N.W.2d 348, 349 (N.D.1990); *State v. Keegan,* 493 N.W.2d 219, 220 (N.D.Ct.App.1992). Consequently, the results of a blood-alcohol test are not necessary to sustain a driving under the influence or an actual physical control conviction. *State v. Pollack,* 462 N.W.2d 119, 122 (N.D.1990); *State v. Whitney,* 377 N.W.2d 132, 133 (N.D.1985). Opinion testimony of sobriety at a critical time is therefore relevant in defending a driving under the influence or an actual physical control charge.

Finally, "impairment of one's defense is the most difficult form of ... prejudice to prove because time's erosion of exculpatory

evidence and testimony 'can rarely be shown.'" *Doggett v. United States*, — U.S. ——, ——, 112 S.Ct. 2686, 2692–2693, 120 L.Ed.2d 520 (1992) (quoting *Barker v. Wingo*, 407 U.S. 514, 532, 92 S.Ct. 2182, 2193, 33 L.Ed.2d 101 (1972)). Although a defendant carries a heavy burden to show actual prejudice to his right to a fair trial, this burden is not insurmountable. *See Doggett; Knoll*, 369 S.E.2d at 565.

## II

■■■ A trial court's findings of fact in preliminary proceedings of a criminal case will not be reversed if, after the conflicts in the testimony are resolved in favor of affirmance, there is sufficient competent evidence fairly capable of supporting the trial court's findings, and the decision is not contrary to the manifest weight of the evidence. *City of Grand Forks v. Risser*, 512 N.W.2d 462, 464 (N.D.1994) (request for second alcohol test); *State v. Murray*, 510 N.W.2d 107, 109 (N.D. 1994) (voluntariness of confession); *State v. Nelson*, 488 N.W.2d 600, 602 (N.D.1992) (reasonable suspicion to stop vehicle); *State v. Everson*, 474 N.W.2d 695, 704 (N.D.1991) (consent to search). We do not conduct a de novo review. *State v. Discoe*, 334 N.W.2d 466, 470 (N.D.1983). We evaluate the evidence presented to see, based on the standard of review, if it supports the findings of fact. *See Risser; Murray; Nelson; Everson; Discoe.*

## III

The City contends the trial court erred in finding Thompson and Bommersbach were actually prejudiced by their periods of detention.

### A

The trial court dismissed two charges against Thompson arising from separate incidents.

#### 1

■■■ At 2:35 a.m. on August 4, 1992, Thompson was arrested for actual physical control after police found him asleep in his vehicle in a Fargo parking lot. Thompson consented to a blood test which was taken at a Fargo hospital. Thompson testified he was not told he had a right to an attorney before taking the test and he was not informed of his right to an independent test. He posted bail and signed a promise to appear. Thompson was taken to Centre Detox at approximately 3:20 a.m. The admission note on the Centre Detox Client Information Form states Thompson was "well kept, healthy[,] co-operative, compliant. Clothes clean[.]" He signed a promise to appear, blew into a "machine," and was told he would have to stay "for a certain length of time before I'd be released again."

According to Thompson, an employee at Centre Detox called his wife and informed her of Thompson's whereabouts. Thompson did not ask to have an attorney called for him. Thompson testified he "asked quite a few times" to use the phone and was told "no one can use the phone." Thompson testified, upon noticing his actions were being entered in a log, he was hesitant to ask Centre Detox employees to call an attorney for him or to ask his wife to call an attorney because "I thought ... it was something that they might hold ... against me later on...." After a shift change, Thompson was allowed to call his employer at 8 a.m. and tell him he would not be at work. Thompson was finally released from Centre Detox at 2:10 p.m. Thompson testified if he had had an opportunity for private telephone conversations, he would have talked to his wife, friends, and a lawyer for advice.

The trial court found Thompson was held at Centre Detox for 11 hours and, having been told by personnel he could not use the telephone, was effectively prohibited from contacting an attorney, who "would have been in a position to advise [Thompson] concerning preparation of his case," or his wife, who "could have come to Centre to secure his release and observe him during the critical period of time shortly after his arrest." Although Thompson was allowed to use the phone at 8 a.m., this was five hours after his arrest. These circumstances were especially significant, the court said, because Thompson's "outward appearance as noted in the Centre records did not indicate impairment."

The trial court found Thompson's "right to fair trial has actually been prejudiced. . . ."

■ There is sufficient competent evidence to support the trial court's finding of actual prejudice and we cannot say the trial court's finding is against the manifest weight of the evidence. We cannot agree with the City's argument the finding of prejudice is based on "pure speculation and surmise." The trial court accepted Thompson's testimony he was denied use of a telephone during the early morning hours following his arrest and detention. The trial court accepted Thompson's statements of what he would have done as fact. While we decline to adopt a per se prejudice rule requiring dismissal when an arrestee is denied use of a telephone, *see Stutlien* at 744, more was presented here. There is evidence Thompson lacked outward signs of alcohol impairment when admitted to Centre Detox. This permitted the trial court to draw a reasonable inference contact with Thompson's wife, friends, or an attorney would have resulted in evidence beneficial to Thompson's defense. *See generally Knoll,* 369 S.E.2d at 562. We conclude the trial court did not clearly err in dismissing the actual physical control charge against Thompson. The decision is supported by sufficient competent evidence, and is not against the manifest weight of the evidence.

### 2

At 1:19 a.m. on September 16, 1992, Thompson was arrested in Fargo for driving under the influence. He was taken to a hospital for a blood test. According to Thompson, the arresting officer did not inform him of his right to an independent test or his right to speak to a lawyer. He posted bail and signed a promise to appear. Thompson was taken to Centre Detox at 2 a.m. Thompson signed a promise to appear and, after taking a breath test, was told he would have to remain there for a certain period of time. A Centre Detox employee called Thompson's wife and told her where he was and how long he would be held there. Thompson testified he was not allowed to use the telephone. At 9 a.m. a Centre Detox employee called Thompson's home to secure a ride for him. Thompson testified if he had been released or been allowed use of a telephone, he would have contacted an attorney and his friends to be possible witnesses in his case. The Centre Detox Client Information Form states Thompson's "clothes were soiled apparently from working, [Thompson] was coherant [sic] and co-operative, polite, [Thompson] was able to walk on his own, without assistance." Thompson was released at 9:55 a.m.

The trial court again found Thompson was actually prejudiced by his detention. The court found Thompson had been detained for more than seven hours, and was not allowed to use a telephone to contact a lawyer or his wife to pick him up or to secure witnesses to view him shortly after the arrest. The trial court accepted Thompson's statements of what he would have done as fact.

Thompson was not given an opportunity to use the telephone. The trial court's finding Thompson suffered actual prejudice from his illegal detention is supported by sufficient competent evidence and is not against the manifest weight of the evidence. *See generally Knoll,* 369 S.E.2d at 562–563. The trial court did not err in dismissing the driving under the influence charge against Thompson.

### B

Bommersbach was arrested in Fargo for actual physical control at 2:21 a.m. on June 23, 1992. Bommersbach was taken to a hospital and given a blood test, but was not informed of his right to a second independent test. He posted bail and signed a promise to appear. He was then transported to Centre Detox at 2:50 a.m. According to Bommersbach, he asked to make a telephone call to his sister "to have her contact a lawyer and get some witnesses together," but was not allowed to do so. The person who refused access to the telephone told Bommersbach he had "to spend however many hours until my blood level was down." Bommersbach was held at Centre Detox for more than 12 hours, being released at 5:15 p.m. The Centre Detox Client Information Form states Bommersbach, upon admission, was "clean, healthy, . . . semi-cooperative, [and] coher-

ent," but was "angry ... [and] refused to take B.A.C. upon intake—later complied."

The trial court found Bommersbach met his burden of showing he was actually prejudiced by his detention. The trial court found Bommersbach was not advised of his right to a second test and was not allowed to make any telephone calls. The trial court found, upon Bommersbach's request "to contact his family to come for him or to contact an attorney[,] he was advised that this would be of no use as he had to stay at Centre until his blood level was down to a certain level as required by the city's policy." The trial court also found Bommersbach asked the arresting officer if he could contact a member of his family, but instead of making a telephone available, the officer told Bommersbach "he could take care of that at Centre...." The trial court found Bommersbach's sister could have come to Centre Detox to secure his release and observe him during this critical time shortly after his arrest, and Bommersbach was denied an opportunity to contact a lawyer, "who would have been in a position to advise [Bommersbach] concerning a second independent test and gathering other evidence in preparation of his case. All of this evidence would have been significant and helpful in [Bommersbach's] defense."

Bommersbach was not given access to a telephone to attempt to seek advice and assistance. *See generally Messner* at 240. Centre Detox records indicate Bommersbach's relatively unimpaired condition upon admission, permitting an inference contact with others would have resulted in evidence helpful to Bommersbach's defense. We conclude the trial court's finding Bommersbach was actually prejudiced by his detention is supported by sufficient competent evidence and is not contrary to the manifest weight of the evidence. *See generally Knoll,* 369 S.E.2d at 562–563. The trial court did not err in dismissing the actual physical control charge against Bommersbach.

## IV

The City contends the trial court erred in finding Dornheim and Franek were actually prejudiced by their periods of detention.

## A

▮ Dornheim was arrested in Fargo for driving under the influence at 12:55 a.m. on September 15, 1992. When Dornheim was taken to a hospital for a blood test, he requested to talk to an attorney. Dornheim was allowed to call an attorney. The attorney came to the hospital and had a "private conversation" with Dornheim. Afterward, Dornheim refused to consent to the blood-alcohol test. Dornheim was taken to jail, where he was allowed to call his boss who came and posted bail for him. Dornheim was then taken to Centre Detox, and was told he "had to sit 12 hours" because he "refused" the test. According to Dornheim he was not allowed to meet with his attorney at Centre Detox. Dornheim acknowledged he was never denied a request to make a phone call at Centre Detox or elsewhere. He did not ask to make a phone call or to take an independent blood-alcohol test while at Centre Detox. After being held at Centre Detox for seven or eight hours, Dornheim was released by writ of habeas corpus obtained by his attorney. Dornheim claimed if he had been released sooner from Centre Detox he could have "met with other people" who would have been able to observe his "demeanor" and "sobriety."

The trial court found the denial of a "further conference" with his attorney at Centre Detox and his "wish ... to be observed by others who could have testified as to his impairment," which "would have been significant in his defense," actually prejudiced Dornheim's right to a fair trial. Under these circumstances, the trial court erred in finding actual prejudice to support dismissal of the charge against Dornheim.

Dornheim was allowed to consult with his attorney before deciding whether to take a blood-alcohol test. He was not denied access to a telephone while detained at Centre Detox. Although he claims he was denied an opportunity to personally consult with his attorney while at Centre Detox, Dornheim did not request to meet with his attorney again, and has failed to link this lack of additional meeting with any type of actual prejudice. Moreover, although he claims he

was prejudiced by being unable to be observed by friends, there is no independent evidence to support an inference observance by friends would have been beneficial to Dornheim's defense. Dornheim's attorney could have immediately proceeded to talk to those who had seen him just before his arrest. In any event, Dornheim was viewed by his boss, who posted bail at the jail before being taken to Centre Detox, and Dornheim testified his boss is available to testify. We conclude there is insufficient competent evidence to support the trial court's finding Dornheim was actually prejudiced by his detention. The trial court's finding is against the manifest weight of the evidence, and it erred in dismissing the driving under the influence charge against Dornheim.

B

■ Franek was 19 when he was arrested for driving under the influence at 7:30 a.m. on April 19, 1992, after being involved in a four-vehicle accident in Fargo. Franek had rear-ended a number of vehicles. Franek refused treatment from the ambulance crew because he "was more worried about the other people than I was about myself." Franek acknowledged he had talked to the other persons involved in the accident before police arrived. He also acknowledged furnishing information to fill in the police accident report. The police accident report contained the names, addresses, telephone numbers, and insurance companies of the people involved in the accident and Franek had access to it. Most of the people at the accident scene had left before Franek and the arresting officer went to the hospital, where Franek submitted to a blood-alcohol test. Franek was then taken to the police station where he was booked. He had access to a telephone at the station, but did not call anyone. He posted bail and signed a promise to appear. Franek was then transported to Centre Detox. He testified he asked personnel there when he would be released because he "wanted to get out and gather evidence." An employee at Centre Detox called his parents for him and "that's all they said they'd do." Franek did not ask Centre Detox personnel to have his parents contact a lawyer. Franek was released at 4 p.m.

Franek did not recall if he asked to talk to a lawyer. He testified he was not told of his right to a second independent test. Franek said he wanted to talk to his parents "[t]o see if they could help me." According to Franek, he felt prejudiced by the detention because "I myself could not get out of there to go gather vital evidence." He said he would have had "somebody drive back to the accident scene, talk to the people that I hit." He further testified if he had been released promptly or been allowed to talk to his parents, he would have called a lawyer or had his parents call a lawyer, who would have told him of his right to a second test.

The trial court found actual prejudice. The court found Franek was denied an opportunity to contact his family "who could have come to Centre to secure his release and observe him during the critical period of time shortly after his arrest...." The court reasoned Franek would have been able to contact an attorney, "a right which he was denied by Centre officials...." According to the court, an attorney could have advised Franek about his right to a second test and helped gather evidence which would have been significant and helpful in his defense.

There is insufficient competent evidence to support the trial court's finding Franek was actually prejudiced by his detention. The trial court's finding is contrary to the manifest weight of the evidence. Franek spoke with the drivers and passengers of the other vehicles involved in the accident and has always had access to their names and addresses which were entered in the police accident report. We see no merit in Franek's claim he was denied access to any crucial evidence relating to the accident. Many nonlaw enforcement witnesses can testify as to their observations of Franek near the time of his arrest. Although the trial court found Franek was denied his right to contact an attorney, the record reflects he made no effort to do so, nor does it reflect the likelihood it would have benefited him. On this record, we conclude the trial court erred in finding actual prejudice and in dismissing the driving under the influence charge against Franek.

## V

Accordingly, we affirm the dismissals of the actual physical control and driving under the influence charges against Thompson and the actual physical control charge against Bommersbach. We reverse the dismissals of the driving under the influence charges against Dornheim and Franek and remand for further proceedings.

VANDE WALLE, C.J., and MESCHKE and NEUMANN, JJ., concur.

LEVINE, J., concurs and dissents.

LEVINE, Justice, concurring and dissenting.

I would affirm all of the trial court's orders of dismissal and therefore, I dissent from the reversal of the orders dismissing Dornheim's and Franek's cases and concur in the affirmance of the other dismissals.

In *City of Fargo v. Stutlien*, 505 N.W.2d 738, 746–47 (N.D.1993), I dissented from the holding that illegally incarcerated defendants had to show actual prejudice arising from their illegal imprisonment. I believed then, as I do now, that a system of justice that not only condones illegal incarcerations but then, adding raw insult to grievous injury, puts the victims to their proof that their illegal incarceration did them damage, is a system that is "broke" and in need of serious fixing. I also suggested that, at the very least, the State, having committed the wrongdoing, should have the burden to show that its misconduct held no reasonable possibility of prejudice to the victims of the illegal imprisonment.

Furthermore, in the context of due process, the issue of prejudice is not confined to whether a defendant can adequately present a defense. *Fuentes v. Shevin*, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). Due process not only guarantees fair play, " '[i]ts purpose, more particularly, is to protect [a person's] use and possession of property from arbitrary encroachment—to minimize substantively unfair or mistaken deprivations of property.' " *United States v. James Daniel Good Real Property*, —— U.S. ——, —— (1993), 114 S.Ct. 492, 501, 126 L.Ed.2d 490 (quoting *Fuentes*, 407 U.S. at 80–81, 92 S.Ct. at 1994). Can it be that one's due process right to liberty without "arbitrary encroachment" or "unfair or mistaken deprivations" is less protected than one's right to the use and possession of property?

This case heralds an unhappy, and unprecedented, additional burden on unfortunate defendants illegally deprived of their liberty. Not only must they prove actual prejudice while the guilty party remains passive, they must prove it to this court. The majority's de novo review of the facts and inferences turns our customary deferential standard of review of facts on its head. The trial judge is abler than we to weigh the facts. That is his business and we should let him do it. In my view, he made no clear error and so I would affirm.